# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

---

## ON REHEARING

---

## NO. 03-17-00499-CV

---

**Nicky E. Dyer; Flora Harrell; Edgar Hoagland; Shirley Hoagland; James Langston; James A. Langston, III; Lois Nelson; Brian Rodel; Richard Ward; Edward A. (Art) Wilson; Montgomery County; and City of Conroe; Appellants**

**v.**

**Texas Commission on Environmental Quality; Bryan W. Shaw, in his official capacity as Chairman of the Texas Commission on Environmental Quality; Buddy Garcia and Carlos Rubinstein, in their official capacities as Commissioners of the Texas Commission on Environmental Quality; and TexCom Gulf Disposal, LLC, Appellees**

---

### FROM THE DISTRICT COURT OF TRAVIS COUNTY, 345TH JUDICIAL DISTRICT NO. D-1-GN-11-001898, HONORABLE TIM SULAK, JUDGE PRESIDING

---

## M E M O R A N D U M   O P I N I O N

On this Court's motion, we withdraw our opinions and judgment issued on May 22, 2019, and substitute the following opinion and judgment in their place.

Raising multiple issues, appellants Nicky E. Dyer; Flora Harrell; Edgar Hoagland; Shirley Hoagland; James Langston; James A. Langston, III; Lois Nelson; Brian Rodel; Richard Ward; Edward A. (Art) Wilson (Individual Appellants); Montgomery County; and the City of Conroe appeal from the trial court's final judgment that affirmed appellee Texas Commission on Environmental Quality's order granting appellee TexCom Gulf Disposal, LLC's application

for permits to construct and operate underground injection control wells for the disposal of non-hazardous, industrial waste.[1] *See* Tex. Water Code § 27.051 (addressing issuance of permit for injection wells). The trial court also dismissed or, in the alternative, denied appellants' claims seeking declaratory relief. For the following reasons, we affirm the trial court's final judgment.

## BACKGROUND

**Statutory Framework**

To give context to the parties' dispute, we begin with a brief overview of the Injection Well Act, which governs the permitting process for underground injection wells in this State. *See generally* Tex. Water Code §§ 27.001–.157; *Railroad Comm'n v. Texas Citizens for a Safe Future & Clean Water*, 336 S.W.3d 619, 626 (Tex. 2011) (discussing Injection Well Act). Under the Injection Well Act, the Texas Commission on Environmental Quality (the TCEQ or the Commission) has jurisdiction over injection wells used for the disposal of "industrial and municipal waste," *see* Tex. Water Code §§ 27.011, .051(a), and the Railroad Commission has jurisdiction over

---

[1] The Individual Appellants have not filed a separate brief in this appeal but adopt by reference the briefing of Montgomery County and the City of Conroe and the briefing of Denbury Onshore, LLC. Denbury and TexCom Gulf Disposal, LLC reached a settlement agreement while this appeal was pending. Denbury filed a motion to dismiss its appeal, which this Court granted. Thus, Denbury is no longer a party to this appeal, and we refer to the Individual Appellants as the parties who raised the issues that were raised by Denbury in its briefing.

Pending before this Court is a motion to allow filing of a supplemental brief by appellants Montgomery County and City of Conroe. They seek to file a supplemental brief addressing the effect of the withdrawal of Denbury from this appeal. We grant the motion and file their supplemental brief, but we observe that the supplemental briefing does not affect our analysis because the Individual Appellants already had adopted Denbury's briefing prior to Denbury's dismissal from this appeal.

injection wells used "to dispose of oil and gas waste," *see id.* §§ 27.031, .051(b).[2] The purpose of the act is "to maintain the quality of fresh water in the state to the extent consistent with public health and welfare and the operation of existing industries, taking into consideration the economic development of the state, to prevent underground injection that may pollute fresh water, and to require the use of all reasonable methods to implement this policy." *Id.* § 27.003.

A company seeking to construct and operate an injection well to dispose of industrial and municipal waste must apply to the TCEQ for a permit. *See id.* § 27.051(a). Among the applicant's requirements, it must "submit with the application a letter from the [R]ailroad [C]ommission concluding that drilling or using the disposal well and injecting industrial and municipal waste into the subsurface stratum will not endanger or injure any known oil or gas reservoir." *Id.* § 27.015(a). Until the applicant has provided the TCEQ with this "no-harm" letter from the Railroad Commission, "the [TCEQ] may not proceed to hearing on any issues other than preliminary matters such as notice." *Id*. § 27.015(b). If the Railroad Commission has issued a no-harm letter under subsection (a), the TCEQ "shall find that there will be no impairment of oil or gas mineral rights." *Id.* § 27.015(c).

---

[2] The Injection Well Act defines "injection well" to mean "an artificial excavation or opening in the ground made by digging, boring, drilling, jetting, driving, or some other method, and used to inject, transmit, or dispose of industrial and municipal waste or oil and gas waste into a subsurface stratum; or a well initially drilled to produce oil and gas which is used to transmit, inject, or dispose of industrial and municipal waste or oil and gas waste into a subsurface stratum; or a well used for the injection of any other fluid; but the term does not include any surface pit, surface excavation, or natural depression used to dispose of industrial and municipal waste or oil and gas waste." Tex. Water Code § 27.002(11).

In granting an application for an injection well permit, the TCEQ's required findings include:

(1)     that the use or installation of the injection well is in the public interest;

(2)     that no existing rights, including, but not limited to, mineral rights, will be impaired;

(3)     that, with proper safeguards, both ground and surface fresh water can be adequately protected from pollution; . . . .

*Id.* § 27.051(a)(1)–(3). In its public interest inquiry under subsection (a)(1), the TCEQ must consider specific criteria, including "whether there is a practical, economic, and feasible alternative to an injection well reasonably available," but the TCEQ may consider other factors as well. *See id.* § 27.051(d).

**Administrative Proceedings**

Appellant TexCom Gulf Disposal, LLC submitted its application to the TCEQ in August 2005.[3]  *See id*. § 27.011; *see also* 30 Tex. Admin. Code § 39.651 (Tex. Comm'n on Environmental Quality, Application for Injection Well Permit).[4]  TexCom sought to develop a commercial non-hazardous industrial wastewater disposal facility on an approximately 27-acre

---

[3]  On its application, TexCom incorrectly represented that it owned the minerals underlying the proposed facility.  During the relevant time period, Sabine Royalty Trust was the mineral interest owner with the right to receive royalties associated with the minerals underlying the proposed facility and adjacent tracts.  Bank of America, N.A., Trustee for Sabine Royalty Trust, filed suit in June 2011 to challenge the permits, but this Court dismissed its claims on jurisdictional grounds.  *See Texas Comm'n on Envtl. Quality v. Denbury Onshore, LLC*, No. 03-11-00891-CV, 2014 Tex. App. LEXIS 7177, at *1 (Tex. App.—Austin July 3, 2014, no pet.) (mem. op.).

[4]  Citations to the Administrative Code are to the TCEQ's rules unless otherwise stated.

4

site in Montgomery County. TexCom's plans for the proposed facility included operating an existing injection well and constructing and operating up to three additional wells to dispose of non-hazardous, industrial wastewater. The existing well's permit had expired, and it had never been operated commercially.

As part of its application, TexCom provided the TCEQ with a no-harm letter from the Railroad Commission dated September 16, 2005, which stated that, based on staff review, the Railroad Commission "[had] concluded that the operation of the proposed wells . . . will not injure or endanger any known oil or gas reservoir." *See* Tex. Water Code § 27.015(a). TexCom's proposed facility would be located within the Conroe Oil Field and would lie atop the Jackson Shale.[5] Below the Jackson Shale is the Cockfield Formation. The Cockfield Formation is comprised of lower, middle, and upper formations or members, and oil and gas has been produced from the Upper Cockfield Formation for over 70 years. TexCom's proposed "injection interval" was the Lower Cockfield Formation, and its proposed "injection zone" was the entire Cockfield Formation. *See* 30 Tex. Admin. Code § 331.2(56), (59) (Definitions).[6] The Jackson Shale is more than 1,000-feet

---

[5] The names and composition of the geologic formations are taken from unchallenged findings of fact. *See* discussion *infra* concerning substantial evidence challenges; *see also Madden v. State Bd. for Educator Certification*, No. 03-11-00584-CV, 2014 Tex. App. LEXIS 5444, at *29 n.4 (Tex. App.—Austin May 22, 2014, pet. denied) (mem. op.) (accepting agency's unchallenged findings as established on appeal).

[6] An "injection interval" is "[t]hat part of the injection zone in which the well is authorized to be screened, perforated, or in which the waste is otherwise authorized to be directly emplaced," and an "injection zone" is "[a] formation, a group of formations, or part of a formation that receives fluid through a well." 30 Tex. Admin. Code § 331.2(56), (59) (Definitions).

thick and would prevent any migration of fluids out of the Cockfield Formation in the area of review (AOR).[7] The underground sources of drinking water (USDWs) in the AOR lie above the Jackson Shale.

The contested-case hearing on TexCom's permit application was held in December 2007. The evidence before the administrative law judges (ALJs) included the suitability of the proposed site geologically for injection wells, the known faults and artificial penetrations in the AOR, and the merit of injection wells to dispose of non-hazardous, industrial waste, generally and specifically as to TexCom's proposed wells, as compared with alternative disposal options, including available options in Montgomery County.[8] The evidence also included the Railroad Commission's 2005 no-harm letter, which was admitted without objection, but other evidence on the proposed injection wells' impact on mineral interests was limited. The lessee-operator of the mineral interests underlying TexCom's proposed site at the time did not seek party status and did not participate in the contested-case hearing. The ALJs issued a proposal for decision (PFD) in April 2008 recommending that the permits be granted with special conditions, but the TCEQ issued

---

[7] The "area of review" (AOR) generally is the area surrounding an injection well or group of wells for which the applicant must detail specified information, and it is determined by a radius of 2.5 miles from the proposed or existing wellbore, or the area within the cone of influence, whichever is greater. *See id.* § 331.42 (Area of Review); *see also id.* §§ 331.2(12), (31) (defining "cone of influence" as "potentiometric surface area around the injection well within which increased injection zone pressures caused by injection of wastes would be sufficient to drive fluids into an underground source of drinking water or freshwater aquifer"), .121(a)(2) (Class I Wells) (listing required information for the TCEQ's consideration prior to issuing a Class I Injection Well Permit).

[8] The artificial penetrations of concern were wells that had been drilled to a depth below the Jackson Shale in the AOR. In its order, the Commission found that "[m]ore than 500 artificial penetrations pierce through the Jackson Shale Formation and into the Cockfield [F]ormation within the AOR for TexCom's proposed operation."

6

an interim order, remanding the matter to the State Office of Administrative Hearings (SOAH) in December 2008 for the parties to undertake additional modeling with more conservative assumptions and another hearing to receive evidence on the modeling, the public interest requirements, and alternative disposal options.[9]

Denbury Onshore, LLC became the lessee-operator of the mineral interests underlying TexCom's proposed site in December 2009 and filed a motion to intervene in the contested case in March 2010. In its motion to intervene, Denbury contended that it was "actively producing oil and gas from the Cockfield Formation in the Conroe Field in the area" of TexCom's proposed facility and that TexCom's proposed operations were "incompatible with Denbury's operations to recover oil, gas and minerals from the Conroe Oil Sands; TexCom's injection activities will allow the injected fluids to migrate into the portions of the Cockfield from which Denbury is recovering oil and gas." Denbury's motion to intervene was granted, and it was designated a party in April 2010.

In a separate matter before the Railroad Commission, the Railroad Commission notified TexCom and Denbury on June 14, 2010, that it would hold a hearing to address Denbury's request that the Railroad Commission withdraw the 2005 no-harm letter. Based on this notice from the Railroad Commission, Denbury filed a motion for continuance in the administrative proceeding

---

[9] Specifically, the TCEQ remanded the matter to SOAH with the following instructions:

[T]o abate the hearing in order for an analysis to be conducted using the 80.9 millidarcy permeability, and an assumption that the fault in question is non-transmissive in the horizontal direction. SOAH shall hold a hearing with that new modeling, and the Commission directs the ALJs to draft an amended PFD to bring back before the Commission. The hearing will also allow for evidence and argument to be taken on the public interest requirements, and alternative disposal options.

7

in this case on June 15, 2010, the first day of the hearing on remand. Denbury requested abatement until after the Railroad Commission proceeding concerning the no-harm letter was completed. The ALJs denied Denbury's motion for continuance and proceeded with the hearing on remand.

The ALJs primarily limited the evidence at the hearing on remand to the topics or subjects as directed by the TCEQ in its remand order. The evidence at the hearing on remand included evidence addressing: (i) TexCom's additional testing and reservoir modeling after the initial hearing, including the accuracy of its determinations of the "cone of influence" from its proposed injection of wastewater, the AOR, and faults and artificial penetrations within the AOR;[10] (ii) available options for disposing of non-hazardous, industrial waste generated in Montgomery County; and (iii) TexCom's potential clients if it was allowed to proceed with its proposed facility. The parties presented conflicting evidence concerning the impact of Denbury's current oil and gas production and its future plans for $CO_2$ enhanced oil recovery (EOR) activities in the Conroe Oil Field on TexCom's proposed injection of wastewater and the potential for wastewater injected by TexCom to migrate to drinking water formations based on Denbury's activities. At the time of the remand hearing in June 2010, one of Denbury's witnesses testified that Denbury was in the "planning stages still" and "approximately four years" away from conducting $CO_2$ EOR activities in the Conroe Oil Field. Prior to beginning those activities, Denbury itself was required to obtain

---

[10] Finding of Fact 103 in the Commission's order defined the "cone of influence" as "the area within which the reservoir pressure build-up over the lifetime of the facility is sufficient to, theoretically, displace a drilling mud plug in an abandoned well exposed to that pressure build-up." *See* 30 Tex. Admin. Code § 331.2(31) (defining "cone of influence").

permits to drill and operate necessary wells, including the wells that would inject $CO_2$ into the Cockfield Formation.[11]

The ALJs issued an amended PFD after remand in November 2010. They recommended that TexCom's permit application be denied. Although they found that TexCom's proposed facility was in a "geologically suitable area," they found that Denbury's current and future operations "pose[d] a risk" that wastewater injected by TexCom "would be pumped to the surface from the injection zone," that Conroe's Publicly Owned Treatment Works (POTW) was a "reasonable alternative" to underground injection of wastewater, and that TexCom did not establish by a preponderance of the evidence that its proposed facility was in the public interest. The TCEQ, however, considered the application at an open meeting on January 26, 2011, issued an order on February 17, 2011, and then reissued the order on April 7, 2011, approving TexCom's application for the injection control well permits. The TCEQ modified approximately 20 of the ALJs' 266 findings of fact and 9 of the ALJs' 54 conclusions of law.

Concerning the hearing before the Railroad Commission addressing the 2005 no-harm letter, the Railroad Commission Examiners held a hearing in August 2010. Both TexCom and Denbury participated in that hearing, and the Examiners issued a report and PFD in November 2010, recommending rescission of the no-harm letter. According to the Examiners' PFD, evidence was presented concerning Denbury's current and future plans for oil production in the Conroe Oil Field.

---

[11] When asked "[h]ow [was] Denbury going to go about putting these wells in," one of Denbury's witnesses answered: "The wells would have to be permitted, and then it would be taken through our land department. Each individual case would be taken through our land department, and they would know the details as to how the surface owner would be contacted and the well would be—the agreement would be worked out to drill the wells."

Denbury attached a copy of the Railroad Commission Examiners' report and PFD to its exceptions to the ALJs' PFD on remand in the administrative proceeding in this case.

Appellants also filed motions to include and supplement the record in the administrative proceeding in this case with the Railroad Commission's subsequent orders concerning the no-harm letter. The Railroad Commission adopted its Examiners' findings and conclusions and rescinded the no-harm letter in an order dated January 13, 2011. In the order, the Railroad Commission stated that the order would "not be final and effective until 20 days after a party is notified of the [Railroad] Commission's order" and that, "[i]f a timely motion for rehearing is filed by any party at interest, this order shall not become final and effective until such motion is overruled, or if such motion is granted, this order shall be subject to further action by the [Railroad] Commission." In an order dated March 8, 2011, the Railroad Commission partially granted TexCom's motion for rehearing as to the January 2011 order.[12] TexCom filed a subsequent motion for rehearing, which the Railroad Commission denied on April 18, 2011.

**Litigation Commenced**

Shortly after the TCEQ reissued its order on April 7, 2011, granting TexCom's permit application, appellants filed suits seeking declaratory relief and judicial review under the Administrative Procedure Act (APA) and the Texas Water Code. *See* Tex. Gov't Code § 2001.174 (addressing scope of judicial review); Tex. Water Code § 5.351 (authorizing judicial review of

---

[12] The March 2011 order contained the same sentences as recited above that were included in the January 2011 order concerning the finality and effective date of the Railroad Commission's order that rescinded the 2005 no-harm letter.

TCEQ orders); Tex. Civ. Prac. & Rem. Code §§ 37.001–.011 ("UDJA"). The trial court consolidated appellants' suits. The parties filed competing motions for partial summary judgment regarding the Railroad Commission's no-harm letter. The trial court granted appellees' motion for partial summary judgment, denied appellants' motion, and ordered that appellants' requests for declaratory relief regarding the no-harm letter were dismissed for want of jurisdiction or, in the alternative, denied.

In June 2017, the trial court held a hearing on the merits. Following the hearing, the trial court affirmed the TCEQ's order and dismissed or, in the alternative, denied appellants' claims for declaratory relief. These appeals followed.

## ANALYSIS

### Standard of Review

Our review of the TCEQ's final order is governed by section 2001.174 of the APA. *See* Tex. Gov't Code § 2001.174; *Slay v. Texas Comm'n on Envtl. Quality*, 351 S.W.3d 532, 548–49 (Tex. App.—Austin 2011, pet. denied) (discussing standard of review under section 2001.174 of APA). Under this standard, "a court may not substitute its judgment for the judgment of the state agency on the weight of the evidence or questions committed to agency discretion." Tex. Gov't Code § 2001.174; *see Firemen's & Policemen's Civil Serv. Comm'n v. Brinkmeyer*, 662 S.W.2d 953, 956 (Tex. 1984) ("The reviewing court is concerned only with the reasonableness of the administrative order, not its correctness."). But we must reverse or remand the case to the state agency for further proceedings if

11

substantial rights of the appellant have been prejudiced because the administrative findings, inferences, conclusions, or decisions are:

(A)     in violation of a constitutional or statutory provision;

(B)     in excess of the agency's statutory authority;

(C)     made through unlawful procedure;

(D)     affected by other error of law;

(E)     not reasonably supported by substantial evidence considering the reliable and probative evidence in the record as a whole; or

(F)     arbitrary or capricious or characterized by abuse of discretion or clearly unwarranted exercise of discretion.

Tex. Gov't Code § 2001.174(2).

With respect to subsection (2)(E) of section 2001.174, "'substantial evidence' does not mean a large or considerable amount of evidence, but such relevant evidence as a reasonable mind might accept as adequate to support a conclusion of law." *Slay*, 351 S.W.3d at 549; *see Texas State Bd. of Dental Exam'rs v. Sizemore*, 759 S.W.2d 114, 116 (Tex. 1988). "Substantial-evidence analysis entails two component inquiries: (1) whether the agency made findings of underlying facts that logically support the ultimate facts and legal conclusions establishing the legal authority for the agency's decision or action and, in turn, (2) whether the findings of underlying fact are reasonably supported by evidence." *AEP Tex. Commercial & Indus. Retail, Ltd. P'ship v. Public Util. Comm'n*, 436 S.W.3d 890, 905 (Tex. App.—Austin 2014, no pet.).

We presume that the agency's findings, inferences, conclusions, and decisions are supported by substantial evidence, and the burden is on the appellant to demonstrate otherwise. *See*

*Froemming v. Texas State Bd. of Dental Exam'rs*, 380 S.W.3d 787, 791 (Tex. App.—Austin 2012, no pet.); *Pierce v. Texas Racing Comm'n*, 212 S.W.3d 745, 751 (Tex. App.—Austin 2006, pet. denied). The evidence in the record may preponderate against the agency's decision but still provide a reasonable basis for the agency's decision and thereby meet the substantial evidence standard. *Texas Gen. Land Office v. Crystal Clear Water Supply Corp.*, 449 S.W.3d 130, 135 (Tex. App.—Austin 2014, pet. denied) (citing *Texas Health Facilities Comm'n v. Charter Med.-Dallas, Inc.*, 665 S.W.2d 446, 452 (Tex. 1984)). "The question of whether an agency's decision is supported by substantial evidence is a question of law, and we owe no deference to the district court's decision." *Id.* (citing *Brinkmeyer*, 662 S.W.2d at 956).

Appellants' issues also concern statutory construction. We review matters of statutory construction de novo. *See Texas Mun. Power Agency v. Public Util. Comm'n*, 253 S.W.3d 184, 192 (Tex. 2007). Our primary concern in construing a statute is the express statutory language. *See Galbraith Eng'g Consultants, Inc. v. Pochucha*, 290 S.W.3d 863, 867 (Tex. 2009). "We thus construe the text according to its plain and common meaning unless a contrary intention is apparent from the context or unless such a construction leads to absurd results." *Presidio Indep. Sch. Dist. v. Scott*, 309 S.W.3d 927, 930 (Tex. 2010) (citing *City of Rockwall v. Hughes*, 246 S.W.3d 621, 625–26 (Tex. 2008)). We consider the entire act, not isolated portions. *20801, Inc. v. Parker*, 249 S.W.3d 392, 396 (Tex. 2008); *see Texas Citizens*, 336 S.W.3d at 628 (explaining that courts "generally avoid construing individual provisions of statute in isolation from the statute as a whole"). Further, we "generally uphold an agency's interpretation of a statute it is charged by the Legislature with enforcing, 'so long as the construction is reasonable and does not contradict the

plain language of the statute.'" *Texas Citizens*, 336 S.W.3d at 625 (quoting *First Am. Title Ins. Co. v. Combs*, 258 S.W.3d 627, 632 (Tex. 2008)).

**No-harm Letter**

Appellants' first two issues concern the Railroad Commission's 2011 order rescinding its 2005 no-harm letter. In their first issue, the County and City argue that the TCEQ's order should be reversed under the APA or declared void under the UDJA because it was issued in the absence of a "valid and subsisting" no-harm letter from the Railroad Commission. According to the County and City, the requirement of a valid no-harm letter is mandatory and jurisdictional, and the Railroad Commission's "conclusions on the potential effect of an injection well on oil and gas resources should be determinative." *See City of DeSoto v. White*, 288 S.W.3d 389, 395–97 (Tex. 2009) (outlining relevant factors for determining whether statutory requirement is jurisdictional); *see also TJFA, L.P. v. Texas Comm'n on Envtl. Quality*, 368 S.W.3d 727, 731–32 (Tex. App.—Austin 2012, pet. denied) (discussing and applying *DeSoto* factors). The County and City focus on the administrative issuance of the no-harm letter "that took less than one day" and without an adjudicatory hearing as compared with the Railroad Commission's decision to rescind the letter "following a full adjudicative hearing in which Denbury and TexCom participated." The Individual Appellants similarly argue in their first issue that the TCEQ lacked authority to grant TexCom's application in the absence of a valid no-harm letter, arguing that the Legislature gave the Railroad Commission "an absolute veto power over the issuance of an injection well permit."[13]

---

[13] As previously stated, although Denbury is no longer a party to this appeal, the Individual Appellants adopted Denbury's briefing. Thus, we refer to the Individual Appellants as the parties

Appellants, however, do not dispute that TexCom timely provided the no-harm letter from the Railroad Commission in 2005 as part of its application prior to the hearings in 2007 and 2010, and that the prior lessees-operators of the mineral interests in the AOR did not seek party status to protest TexCom's application. In the no-harm letter, which was admitted during the 2007 hearing without objection, the assistant director for the Railroad Commission stated that Railroad Commission staff had reviewed the portion of TexCom's application "relating to possible injury or endangerment of any known oil and gas reservoir" and, based on staff review, "concluded" that the operation for the proposed injection wells "into the Cockfield Formation (subsurface interval 5,134 to 6,390) will not injure or endanger any known oil or gas reservoir." The assistant director also described the staff's review in the preceding paragraph to the Railroad Commission's conclusion as follows:

> Specifically, our review entailed a study of the aspects of the application relating to the injection operation, geology of the area, and location and well records of the artificial penetrations within the area of review (.25 mile). We also used the Railroad Commission's computerized mapping system to verify that all artificial penetrations within the area of review have been identified in the application.

Applying the statute's plain language in the context of this appeal, we conclude that TexCom complied with the express requirements of section 27.015(a) of the Injection Well Act by submitting a no-harm letter from the Railroad Commission as part of its application in 2005, and, therefore, that section 27.015(b) of the Injection Well Act did not prohibit the hearings on the merits from proceeding in 2007 and 2010. *See* Tex. Water Code § 27.015(a) (requiring submission of

who raised the issues that were raised by Denbury in its briefing.

no-harm letter with application), (b) (prohibiting TCEQ from proceeding to hearing on merits until no-harm letter from Railroad Commission had been provided); *see Scott*, 309 S.W.3d at 930.

In contrast, appellants' proposed interpretation of section 27.015 goes beyond the express statutory language. *See Iliff v. Iliff*, 339 S.W.3d 74, 80–81 (Tex. 2011) (explaining that courts "have no right to engraft upon the statute any conditions or provisions not placed there by the legislature" (quoting *Duncan, Wyatt & Co. v. Taylor*, 63 Tex. 645, 649 (1885))). The Railroad Commission's order rescinding its 2005 no-harm letter was not final until April 18, 2011—when the Railroad Commission denied TexCom's subsequent motion for rehearing—which was after the hearings before the ALJs in this case were completed, the administrative record closed, the open meeting at which the TCEQ Commissioners voted to grant TexCom's permit application had occurred, and the TCEQ's order granting the permits had been issued. Under appellants' proposed interpretation of section 27.015, the Railroad Commission's rescission of a no-harm letter at any time—even years after the completion of an administrative proceeding before the TCEQ—would void the corresponding TCEQ order granting an application for injection well permits. Directed by the plain language of the statute, we decline to expand the language of section 27.015 as appellants advocate. *See id.*; *see also, e.g.*, *Jones v. State Bd. of Educator Certification*, 315 S.W.3d 237, 243 (Tex. App.—Austin 2010, pet denied) (noting "importance of construing the APA to allow parties to rely on finality of agency decisions").

We also observe that appellants' interpretation of section 27.015 is incompatible with the plain language of section 27.051(a) of the Injection Well Act that expressly authorizes and requires the TCEQ to make the determination of whether "existing rights, including, but not limited

16

to, mineral rights, will be impaired" as part of its decision to grant a permit application. *See* Tex. Water Code § 27.051(a)(2) (requiring TCEQ to find that "no existing rights, including, but not limited to, mineral rights, will be impaired"); *Texas Citizens*, 336 S.W.3d at 625 (viewing provision in context of statute as whole); *see, e.g.*, Tex. Water Code §§ 27.033 (requiring permit applicant to Railroad Commission to submit "letter of determination from the railroad commission stating that drilling and using the disposal well and injecting oil and gas waste into the subsurface stratum will not endanger the freshwater strata in that area and that the formation or stratum to be used for the disposal is not freshwater sand"), .051(b)(3) (requiring Railroad Commission in its determination whether to grant permit application to find "that, with proper safeguards, both ground and surface fresh water can be adequately protected from pollution").

And appellants' interpretation cannot be squared with the plain language of section 27.015(c) that expressly limits the TCEQ in its findings when the Railroad Commission has issued a no-harm letter. *See* Tex. Water Code § 27.015(c). Viewing sections 27.051 and 27.015(c) together, we conclude that they support the TCEQ's interpretation of these statutes in the factual context of this appeal—where TexCom filed the no-harm letter from the Railroad Commission, the no-harm letter was admitted as evidence without objection during the hearings on the merits, and the Railroad Commission did not rescind the letter until after the hearings had already concluded and the administrative record closed. *See Texas Citizens*, 336 S.W.3d at 625 (explaining that courts generally uphold agency's interpretation of statute it is charged with enforcing so long as construction is reasonable and does not contradict statute's plain language). On these bases, we overrule appellants' first issues.

17

In their respective second issues, appellants argue that, even if the statutory requirements concerning the no-harm letter did not preclude the TCEQ from issuing the permits, the TCEQ acted arbitrarily and capriciously and abused its discretion by refusing to consider the "critical" evidence that the Railroad Commission had decided to rescind its 2005 no-harm letter. In particular, the Individual Appellants argue that, "even if TCEQ were permitted to issue TexCom's permits notwithstanding the revocation of the no-harm letter, its process was arbitrary and capricious given the great weight that TCEQ placed on the no-harm letter before it was revoked combined with its conscious decision to ignore that revocation." "[A]t a minimum," according to the Individual Appellants, the revocation of the no-harm letter "should have triggered an obligation to conduct further fact-finding on harm to minerals." The Individual Appellants contend that the TCEQ was required to reopen the record to consider the Railroad Commission's decision to rescind the no-harm letter and, therefore, that it acted arbitrarily and capriciously when it failed to do so.

On this record, however, we cannot conclude that the TCEQ acted arbitrarily and capriciously or abused its discretion concerning the no-harm letter. As noted above, (i) the Railroad Commission's order rescinding the 2005 no-harm letter was not final until April 18, 2011, but the initial contested-case hearing in this case was in 2007; (ii) the lessee-operator of the mineral interests from TexCom's submission of its application in 2005 until Denbury's intervention in 2010 did not seek party status to challenge TexCom's proposed facility; (iii) the no-harm letter was admitted during the 2007 hearing without objection and, thus, was properly considered as evidence before the ALJs; (iv) the 2010 hearing on remand was expressly limited to specified topics that did not include impairment of mineral rights; (v) the administrative record was completed and closed in 2010; and

18

(vi) the TCEQ voted to approve TexCom's permit application in January 2011. *See* Tex. Gov't Code § 2003.047(m) (allowing TCEQ to amend PFD, including findings of fact, but "any such amendment thereto and order shall be based solely on the record made before the administrative law judge"). The evidence at the remand hearing also showed that Denbury was only in the "planning stages" for its proposed $CO_2$ EOR activities—according to the testimony of its own witness, "approximately four years" away—and its plans were contingent and uncertain. Before operations could begin, Denbury had to obtain permits to construct and operate necessary wells, and it had to complete its planning, including determining the location of required wells for undertaking $CO_2$ EOR activities in the Conroe Oil Field.

We also observe that, in addition to the Railroad Commission's no-harm letter, evidence presented during the 2007 hearing supported the TCEQ's finding that "no existing . . . mineral rights[] [would] be impaired." *See* Tex. Water Code § 27.051(a)(2). For example, the parties presented evidence concerning the suitability of the site geologically, including the potential impact on oil and gas production. TexCom presented evidence that its waste plume would remain in the injection interval, the Lower Cockfield Formation, and that oil and gas production historically was from the Upper Cockfield Formation.[14] The ALJs' findings of fact on the suitability of the site

---

[14] Other evidence included testimony from a certified petroleum geologist who testified that he "[did] not believe that any existing rights, including mineral rights, [would] be impaired by the operation of the TexCom injection project." He explained his belief that "fluids in the Injection Interval will remain isolated in that interval" and that he "[did] not believe that the injection of fluids into the Lower Cockfield [would] injure the continued production of oil and gas from other zones in the field." The engineer who supervised the preparation of TexCom's application also answered, "No," when asked if he believed that any rights, including existing mineral rights, would be impaired by the construction and operation of TexCom's proposed injection wells, explaining his answer as follows:

19

geologically included Finding of Fact 179: "The proposed injection wells would not impair any existing mineral rights given the geological structure of the site." The TCEQ adopted this finding in its order.

In contrast, the Railroad Commission Examiners' report and PFD, which was issued in November 2010, discussed the decision as to whether to rescind the no-harm letter in the context of Denbury's future plans at that time and included among the relevant considerations increased operating costs if TexCom were allowed to proceed with its proposed facility. As stated by the Railroad Commission Examiners in their report and PFD:

> If TexCom is allowed to dispose of waste into the Lower Cockfield, Denbury's operating costs will increase due to a need to lift additional fluids as pressure increases in the Upper Cockfield. Additionally, because a $CO_2$ flood is planned for the field, if the waste injected by TexCom is transmitted to the Upper Cockfield, these wastes are likely to be incompatible with formation fluids and production equipment, again resulting in increased costs.

Crediting these statements, the TCEQ reasonably could have determined that, although Denbury's operating costs would increase, TexCom's proposed injection wells would not prevent Denbury from proceeding with its planned $CO_2$ EOR operations in the Conroe Oil Field.

---

The proposed injection zone is well below the nearest oil/gas producing formation, the Upper Cockfield. Also, there are no producing wells near TexCom's proposed injection wells and most of the previously producing wells in the area have been plugged for many years. Our analysis, using formation-specific information, models and engineering calculations, shows that the unplugged wells will not be a conduit to waste water or other mineral sources that are displaced by injection. Finally, the Texas Railroad Commission formally reviewed TexCom's proposal and determinated that it will not adversely impact the production capacity within the area.

20

On this record, even if we assume that appellants properly moved to reopen the record for additional evidence, we cannot conclude that the TCEQ acted arbitrarily and capriciously or abused its discretion concerning the Railroad Commission's decision in 2011 to rescind the 2005 no-harm letter. *See* Tex. Gov't Code § 2003.047(m) ("The commission *may* also refer the matter back to the administrative law judge . . . to take additional evidence . . . ." (emphasis added)); *see also id.* § 311.016(1) ("'May' creates discretionary authority or grants permission or a power."). The TCEQ reasonably could have weighed the relevant factors and found that the timing of appellants' requests to reopen the record would have caused "undue delay" and that denying those requests would not result in "an injustice." *See Pretzer v. Motor Vehicle Bd.*, 125 S.W.3d 32, 41 (Tex. App.—Austin 2003), *aff'd in part*, *rev'd in part on other grounds*, 138 S.W.3d 908 (Tex. 2004) (listing factors for agency to consider in determining whether to grant motion to reopen evidence including "whether the evidence in support of the motion to reopen is 'material, relevant, and decisive,' whether reception of such evidence will cause any undue delay, and whether refusal to reopen will do an injustice"). We overrule appellants' second issues.

**TCEQ's Changes to Findings of Fact**

In their respective third issues, appellants argue that the TCEQ improperly rewrote many of the ALJs' adjudicative and underlying findings of fact in violation of section 2001.058(e) of the APA, *see* Tex. Gov't Code § 2001.058(e), and the County and City also argue that the TCEQ made changes that were not based solely on the record that was before the ALJs in violation of section 2003.047(m) of the APA, *see id.* § 2003.047(m). Appellants argue that the TCEQ violated section 2001.058(e) by its changes to the ALJs' findings regarding: (1) the geologic nature of the

21

layers between the Lower, Middle, and Upper Cockfield Formations; (2) whether those layers will

prevent the upward migration of fluids; (3) the effect of oil and gas production on the subsurface

migration of fluids; and (4) whether TexCom's waste could be pumped to the surface.[15]

Section 2001.058(e) of the APA generally applies to state agencies and provides that:

A state agency may change a finding of fact or conclusion of law made by the administrative law judge, or may vacate or modify an order issued by the administrative judge, only if the agency determines:

(1)     that the administrative law judge did not properly apply or interpret applicable law, agency rules, written policies provided under Subsection (c), or prior administrative decisions;

(2)     that a prior administrative decision on which the administrative law judge relied is incorrect or should be changed; or

(3)     that a technical error in a finding of fact should be changed.

The agency shall state in writing the specific reason and legal basis for a change made under this subsection.

*Id.* § 2001.058(e).

In contrast, section 2003.047 specifically addresses hearings for the TCEQ, and

subsection (m) of that section states in relevant part:

Except as provided in Section 361.0832, Health and Safety Code, the commission shall consider the proposal for decision prepared by the administrative law judge, the exceptions of the parties, and the briefs and argument of the parties. The commission

---

[15] Specifically, based on the requirements of section 2001.058(e), appellants challenge the TCEQ's changes to the ALJs' findings of fact 91, 93, 112, 113, 114, 196, and 199 and conclusion of law 29, and the Individual Appellants also challenge the Commission's changes to finding of fact 94 and conclusion of law 44 on this basis.

22

may amend the proposal for decision, including any finding of fact, but any such amendment thereto and order shall be based solely on the record made before the administrative law judge. Any such amendment by the commission shall be accompanied by an explanation of the basis of the amendment. The commission may also refer the matter back to the administrative law judge to reconsider any findings and conclusions set forth in the proposal for decision or take additional evidence or to make additional findings of fact or conclusions of law. The commission shall serve a copy of the commission's order, including its finding of facts and conclusions of law, on each party.

*Id.* § 2003.047(m). Also relevant to this appeal, subsection (n) of section 2003.047 provides: "The provisions of Chapter 2001 shall apply to contested case hearings for the commission to the extent not inconsistent with this section." *Id.* § 2003.047(n). Whether the TCEQ was restricted by the limits set forth in section 2001.058(e) for modifying the ALJs' PFD then depends on whether section 2001.058(e) is consistent with section 2003.047(m). *See id.*

Viewing section 2003.047(m) as a whole, the legislature first excepted hearings under the Solid Waste Disposal Act, expressly referencing section 361.0832 of the Texas Health and Safety Code. *See* Tex. Health & Safety Code § 361.0832. That section provides specific standards for contested cases in the context of the Solid Waste Disposal Act and states that, to the extent of a conflict between it and section 2001.058(e), its provisions control. *Id.* § 361.0832(g). Among the applicable standards, "[t]he commission may overturn an underlying finding of fact that serves as the basis for a decision in a contested case only if the commission finds that the finding was not supported by the great weight of evidence" and "may overturn a conclusion of law in a contested case only on the grounds that the conclusion was clearly erroneous in light of precedent and applicable law." *Id.* § 361.0832(c), (d). The TCEQ also is required to "fully explain in a ruling,

23

order, or decision the reasoning and grounds for overturning each finding of fact or conclusion of law or for rejecting any proposal for decision on an ultimate finding." *Id.* § 361.0832(f).

In contrast, following the first sentence of section 2003.047(m) that references section 361.0832, the legislature in the next two sentences authorizes the TCEQ in contexts outside of the Solid Waste Disposal Act to amend a PFD, "including any finding of fact" with only two stated limitations: (i) "any such amendment thereto and order shall be based solely on the record made before the [ALJ]," and (ii) "[a]ny such amendment by the commission shall be accompanied by an explanation of the basis of the amendment." Tex. Gov't Code § 2003.047(m). The legislature's expressed limits on the TCEQ's authority to amend "any finding of fact" supports that it did not intend other unstated ones. *See, e.g.*, *CKB & Assocs., v. Moore McCormack Petroleum, Inc.*, 734 S.W.2d 653, 655 (Tex. 1987) (explaining the maxim *expressio unius est exclusio alterius* to mean "that the naming of one thing excludes another"); *Johnson v. Second Injury Fund*, 688 S.W.2d 107, 108–09 (Tex. 1985) (stating that "legal maxim *Expressio unius est exclusio alterius* is an accepted rule of statutory construction in this state" through which "express mention or enumeration of one person, thing, consequence or class is equivalent to an express exclusion of all others"); *Harlingen Family Dentistry, P.C. v. Texas Health & Human Servs. Comm'n*, 452 S.W.3d 479, 482 (Tex. App.—Austin 2014, pet. dism'd) (explaining that, although the doctrine of "unius est exclusion alterius" is not an absolute rule, it can be helpful in statutory construction cases). The last two sentences of section (m) then allow the TCEQ to refer the matter back to the ALJ for reconsideration or to take additional evidence and require the TCEQ to serve copies of its order on the parties. *See* Tex. Gov't Code § 2003.047(m).

Applying the plain language of both section 2001.058(e) and 2003.047(m), we conclude that section 2001.058(e) does not apply here.[16] *See Slay*, 351 S.W.3d at 550 (explaining court's interpretation of section 2003.047(m) "to require that any changes to the ALJ's proposed

[16] As support for their position that section 2001.058(e) applies to the TCEQ's modifications to the ALJs' PFD, appellants cite cases in which the court cited section 2001.058(e) and the TCEQ was a party. *See Wood v. Texas Comm'n on Envtl. Quality*, No. 13-13-00189-CV, 2015 WL 1089492, at *10 (Tex. App.—Corpus Christi Mar. 5, 2015, no pet.) (mem. op.); *Travis County v. Texas Comm'n on Envtl. Quality*, No. 07-12-00457-CV, 2014 WL 1722335, at *8 (Tex. App.—Amarillo Apr. 29, 2014, pet. denied) (mem. op.). In those cases, however, the parties did not join issue as to whether subsections (1) to (3) of section 2001.058(e) applied to the TCEQ in light of section 2003.047(n). *See Wood*, 2015 WL 1089492, at *10–11 (discussing requirements in section 2001.058(e) but concluding that substantial evidence in record to support TCEQ's changes to ALJ's order); *Travis County*, 2014 WL 1722335, at *8–9 (citing section 2001.058(e) generally for proposition that "[a]n agency has limited authority to change a finding of fact or conclusion of law made by an ALJ or to vacate or modify an order of an ALJ" but not applying it to facts in case and finding that "any error of the Commission in requiring the ALJ to delete the noted findings and conclusions was harmless").

Further, because section 2003.047(m) expressly authorizes the TCEQ to amend a PFD, including findings of fact, we find cases cited by appellants that address boards or agencies without comparable statutory authorization to be unhelpful to our analysis. *See, e.g.*, *Montgomery Indep. Sch. Dist. v. Davis*, 34 S.W.3d 559, 565–66 (Tex. 2000) (concluding that section 21.259(c) of Education Code limited school board's review of facts "to conducting a substantial evidence review" and noting that "provisions governing the hearing-examiner process in the Education Code impose greater restrictions on a school board than the APA does on state agencies"); *Texas State Bd. of Med. Exam'rs v. Dunn*, No. 03-03-00180-CV, 2003 Tex. App. LEXIS 9833, at *1, 7 (Tex. App.—Austin Nov. 20, 2003, no pet.) (mem. op.) (concluding that board did not have "unlimited discretion" to change ALJ's findings of fact and conclusions of law, that it "did not establish a reasonable evidentiary basis" for rejecting ALJ's findings and conclusions, and that section 2001.058 applied); *Flores v. Employees Ret. Sys. of Tex.*, 74 S.W.3d 532, 539, 541–42 (Tex. App.—Austin 2002, pet. denied) (concluding that "Board failed to comply with its statutory authorizations and administrative rules, which enable the Board to make changes [to findings of fact] but also place limits on its ability to do so," citing Tex. Gov't Code § 815.511(d), which authorizes Board "in its sole discretion" to modify or delete findings of fact or to make alternative ones and to adopt rules for implementation of subsection, and 34 Tex. Admin. Code § 67.91 (Employees Ret. Sys. of Tex., Form, Content, and Service of Orders), which places limits on Board's authority to modify or delete findings of fact and conclusions of law or to make alternative ones).

findings and conclusions be reviewed under APA section 2001.174—i.e., . . . review[ing] legal conclusions for error of law and factual findings for support by substantial evidence"); *see, e.g.*, *State v. Mid-South Pavers, Inc.*, 246 S.W.3d 711, 721–22 (Tex. App.—Austin 2007, pet. denied) (concluding that "phrase '[n]otwithstanding any law to the contrary' makes clear the legislature's intent that section 201.112(c) [of Texas Transportation Code] supersede other Texas law regarding an agency's ability to change findings of fact or conclusions of law, including section 2001.058 of the APA"); *Southwestern Pub. Serv. Co. v. Public Util. Comm'n*, 962 S.W.2d 207, 212–13 (Tex. App.—Austin 1998, pet. denied) (interpreting provision in section 2003.049(g) of Government Code that allowed Public Utility Commission to change ALJ's findings if Public Utility Commission determined that finding "[was] not supported by a preponderance of the evidence" and concluding that provision expressly superseded section 2001.058 of APA). Thus, we limit our analysis to appellants' challenges that are based on section 2003.047(m) and whether the record that was made before the ALJs supports the TCEQ's changes to the challenged findings.[17] *See* Tex. Gov't

---

[17] The Individual Appellants argue that sections 2003.047(m) and 2001.058(e) are not inconsistent because section 2003.047(m) does not provide the "standard" for when the TCEQ can amend a finding of fact so that the standard set forth generally for agencies in section 2001.058(e) to change findings of fact applies. But this interpretation would render section 2003.047(m) meaningless. *See Entergy Gulf States, Inc. v. Summers*, 282 S.W.3d 433, 441 (Tex. 2009) (observing that courts do not interpret statutes in manner that renders parts meaningless); *cf.* Tex. Health & Safety Code § 361.0832 (Proposal for Decision; Certified Issues; Reversal by Commission) (allowing TCEQ in context of Solid Waste Disposal Act to overturn underlying finding of fact that serves as basis for decision in contested case "only if the commission finds that the finding was not supported by the great weight of the evidence" and stating that section controls to extent of conflict with section 2001.058(e) of APA). Because state agencies generally may not consider evidence outside of the administrative record following a contested case hearing, it was unnecessary to limit the TCEQ's authority to amend findings of fact "based solely on the record made before the [ALJ]" in section (m) except to signal the APA limitations under chapter 2001 that applied. *See* Tex. Gov't Code § 2001.175 (setting forth procedure for review under substantial evidence or

Code § 2003.047(m); *see also id.* § 2001.060 (listing items included in record from contested case); *McHaney v. Texas Comm'n on Envtl. Quality*, No. 03-13-00280-CV, 2015 Tex. App. LEXIS 1903, at *18–24 (Tex. App.—Austin Feb. 27, 2015, no pet.) (mem. op.) (applying section 2003.047(m) to TCEQ's modification of findings and conclusions by ALJ).

As to section 2003.047(m), the County and City argue that the record does not contain evidence to support the TCEQ's changes to the ALJs' Findings of Fact 112 and 114. The TCEQ changed Finding of Fact 112 to substitute "may create" for "creates" in the following sentence: "The production of fluids from Denbury's production wells ~~creates~~ may create areas of low pressure, or pressure sinks, at or near the wells."[18] The TCEQ changed Finding of Fact 114 to substitute "would not" for "could eventually" and added "even" at the beginning in the following sentence: "Even [i]f TexCom's wastewater plume migrates from the Lower Cockfield Injection Interval to the Upper Cockfield portion of the Injection Zone, it ~~could eventually~~ would not be pumped to the surface through Denbury's production wells."

Based on our review of the record, we conclude that there was evidence before the ALJs to support the TCEQ's changes to Findings of Fact 112 and 114. The parties presented conflicting evidence about the migration of fluids within the Cockfield Formations, the waste plume

---

undefined scope of review); *Basse Truck Line, Inc. v. Texas Natural Res. Conservation Comm'n*, 2003 Tex. App. LEXIS 5941, at *11 (Tex. App.—Austin July 11, 2003, pet. dism'd) (mem. op.) ("An agency decision must be decided on the facts presented by the contestants, not by influences outside the record." (citing *Young Chevrolet, Inc. v. Texas Motor Vehicle Bd.*, 974 S.W.2d 906, 914 (Tex. App.—Austin 1998, pet. denied))).

[18] Finding of Fact 112 also includes the following sentence that the Commission did not change: "In underground formations, fluids migrate from areas of higher pressure towards pressure sinks."

from TexCom's proposed injection wells, differentials in pressure within the Cockfield Formations, and the impact of Denbury's current and future operations on TexCom's proposed injection wells. Based on the conflicting evidence concerning pressure within the Cockfield Formations and the uncertainty of Denbury's future plans, including that the locations of wells for its future operations were yet to be determined, the record supports the TCEQ's change to Finding of Fact 112 that Denbury's production "may create" "pressure sinks, at or near the wells" instead of the ALJs' definitive finding that it would. As to Finding of Fact 114, TexCom presented evidence that existing wells in the AOR would not be affected by TexCom's proposed injection of fluid, and the finding is limited to Denbury's "production wells." Although there was conflicting evidence, we conclude that the record also supports the TCEQ's changes to Finding of Fact 114.

Further, we conclude that, even if the record did not support the TCEQ's changes to Findings of Fact 112 and 114, appellants have failed to show that their substantial rights were prejudiced by the changes. *See* Tex. Gov't Code § 2001.174(2) (authorizing court to reverse or remand case to agency for further proceedings "if substantial rights of the appellant have been prejudiced . . . ."). On these bases, we overrule appellants' third issues.

**TCEQ's Explanation for Changes**

In their respective fourth issues, appellants argue that the Commission's purported explanation of the changes that it made to the ALJs' findings violated sections 2001.058(e) and 2003.047(m) of the APA. The County and City argue that the purported explanation was arbitrary and capricious, that the TCEQ failed to identify or discuss the evidence in the record supporting the changes, and that the explanation was "nonsensical, conclusory, contains unfounded and unsupported

28

assertions, and employs circular logic." They describe the TCEQ's approach as "upside-down" "to reach a pre-determined conclusion." The Individual Appellants similarly argue that the TCEQ was not permitted to rewrite the substantive findings of the ALJs, that it cannot overturn the ALJs' fact findings "at its whim," and that the TCEQ failed to provide a "specific reason" for each change to the ALJs' findings and conclusions.

As previously stated, section 2001.058(e) states that "[t]he agency shall state in writing the specific reason and legal basis for a change made under this subsection," Tex. Gov't Code § 2001.058(e), and section 2003.047(m) states that any amendment to a PFD by the TCEQ "shall be accompanied by an explanation of the basis of the amendment," *id*. § 2003.047(m). As stated above, whether the requirements in section 2001.058(e) apply depend on whether they are consistent with section 2003.047(m). *See id.* § 2003.047(n). Applying the plain language of sections 2001.058(e) and 2003.047(m), we conclude that, to the extent that section 2001.058(e) requires a more specific explanation than section 2003.047(m), it does not apply here. Thus, we limit our analysis to whether the TCEQ complied with the requirement in section 2003.047(m) that changes by the TCEQ to the PFD "be accompanied by an explanation of the basis of the amendment."

In addition to detailing the changes that it made to particular findings of fact and conclusions of law, the TCEQ provided the following explanation in its order:

> The Commission directed that the above changes to the ALJs' Proposed Order be made in light of the Commission's determination that the record establishes that no adverse health or welfare effects will result from the injection of commercial non-hazardous waste into TexCom's injection wells and that TexCom met its burden of proof regarding the confining layers of the injection zone. The Commission concluded that the record establishes that: 1) there is no potential endangerment to any underground sources of drinking water ("USDW"); 2) the project is in the public

29

interest; and 3) there is no practical, economic, and feasible alternative to an injection well reasonably available.

As to the potential for contamination to USDWs, the Commission found that for contamination to occur, Denbury would have to receive authorization for their carbon dioxide enhancement recovery operations which are currently speculative operations. TexCom's project has been in the works for many years and migration through the Cockfield Formation would be unlikely unless produced by Denbury and pumped into a USDW, and begin creating preferential flows or a pathway for migration. The Commission found that the ALJ made the determination based on the evidence that there would be no pathway for the waste to migrate. TexCom adequately identified that there would be no artificial penetrations in the Jackson Shale or in the area of concern. Because the evidentiary record shows that the Commission's authorization is protective of USDWs, and Denbury's authorizations have yet to be approved by the Railroad Commission, the Commission finds that the existing UIC permits are protective as recommended by the Executive Director and should be granted.

In addition to this finding, the Commission determined that, based on the evidentiary record, 90% of Montgomery County's existing commercial nonhazardous waste is going outside the county for disposal and that some generators are not within the certificate of convenience and necessity ("CCN") of the Conroe POTW where Protestants allege that the waste would be treated and disposed. As a result, the record does not support a finding that there was a practical, economic, feasible, and reasonably available alternative to injection.

Applying the plain language of section 2003.047(m), we conclude that the TCEQ's explanation was sufficient to comply with the section's requirements. In its order, the TCEQ specifically listed each of the changes to the ALJs' PFD "accompanied by [its] explanation of the basis of the amendment[s]." *See* Tex. Gov't Code § 2003.047(m); *Slay*, 351 S.W.3d at 551–52 (discussing Commission's "inclusion of an explanation for each change" in declining to "say that [Commission]'s amendments to the ALJ's conclusions were arbitrary"); *see also, e.g.*, *Pierce*, 212 S.W.3d at 751–52, 755 (applying section 2001.058(e) and concluding that board properly modified proposal for decision where its order included three paragraphs under heading "Reason for

Modification," explaining specific reasons for modification); *Grotti v. Texas State Bd. of Med. Exam'rs*, No. 03-04-00612-CV, 2005 Tex. App. LEXIS 8279, at *9, 27–30 (Tex. App.—Austin Oct. 6, 2005, no pet.) (mem. op.) (applying section 2001.058(e) and concluding that board properly modified PFD where its order included explanation of why recommended sanction did not address severity of conduct, was too lenient to be effective, and was insufficient to protect public). We overrule appellants' fourth issues.

**Substantial Evidence Challenges**

In their respective fifth issues, appellants make substantial-evidence challenges to certain findings of fact and conclusions of law. *See* Tex. Gov't Code § 2001.174(2)(E). The County and City argue that the TCEQ, to support its changes to Finding of Fact 114 and Conclusion of Law 29, must have made "the implicit finding that for contamination to USDWs to occur, Denbury would need to conduct enhanced $CO_2$ recovery operations" and that this implied finding is not supported by substantial evidence in the record. To support this position, the County and City focus on evidence that addressed Denbury's "current" oil and gas operations. The Individual Appellants similarly focus on evidence of Denbury's "current" operations to argue that there is no substantial evidence to support Findings of Fact 114 and 198 and Conclusion of Law 29. They also challenge the evidence to support Finding of Fact 196 and contend that there is no substantial evidence to support the TCEQ's conclusion that "there [were] no reasonable available alternatives" to injection. We turn then to determine whether there is substantial evidence in the record to support the challenged findings of fact and conclusion of law.

31

**Challenges based on Denbury's current operations**

Relying on evidence of Denbury's current operations, the Individual Appellants argue that "[t]here is no evidence in the record to suggest that Denbury's current operations would not produce TexCom's waste if it were in the Upper Cockfield," and they challenge Findings of Fact 114 and 198:

> 114. Even if TexCom's wastewater plume migrates from the Lower Cockfield Injection Interval to the Upper Cockfield portion of the Injection Zone, it would not be pumped to the surface through Denbury's production wells.
>
> . . .
>
> 198. Even if the wastewater injected by TexCom migrates to the Upper Cockfield, the oil and gas production in the Conroe Oil Field, particularly the proposed carbon dioxide enhanced oil recovery, would not pull the wastewater back to the surface.

And they challenge Conclusion of Law 29:

> 29. Denbury's hydrocarbon production wells completed in the Upper Cockfield portion of the injection Zone could not pump to the surface the wastewater injected by TexCom into the Lower Cockfield Injection Interval that migrates to the Upper Cockfield.[19]

The County and City also rely on evidence of Denbury's current operations to support their position that the TCEQ's implicit finding concerning potential contamination of USDWs was not supported by substantial evidence.

---

**19** The TCEQ changed Conclusion of Law 29 by adding the word "not" as follows: "Denbury's hydrocarbon production wells completed in the Upper Cockfield portion of the Injection Zone could <u>not</u> pump to the surface the wastewater injected by TexCom into the Lower Cockfield Injection Interval that migrates to the Upper Cockfield."

The challenges to these findings of fact and conclusion of law and the TCEQ's "implicit" finding of fact depend on appellants' view of the evidence concerning the suitability of TexCom's proposed site geologically. Appellants presented evidence that the Cockfield Formations are in "communication" with each other such that TexCom's waste plume would migrate to the Upper Cockfield Formation where Denbury currently was producing oil. This evidence, however, was disputed by TexCom. TexCom presented evidence that its injected waste would remain confined within its proposed injection interval, the Lower Cockfield Formation, but that, even if the injected waste did migrate, it would not affect Denbury's current production wells. The parties presented conflicting evidence concerning the layers or members of the Cockfield Formation and whether they were in communication with each other, such that fluid could migrate between the layers or members, and the possibility of migration of TexCom's waste plume and its impact on Denbury's operations if it reached the Upper Cockfield Formation.

TexCom presented evidence that the Upper, Middle, and Lower Cockfield Formations were separated from one another by 30- to 40-foot shale, that the only place the layers or members would be in communication would be at a fault 4,400 feet south of TexCom's proposed facility, and that the waste plume from TexCom's proposed injection would not migrate to that fault. Further, expert evidence showed that, even if the waste plume migrated to the fault, the fault was not transmissive, so that the waste plume would not migrate from the Lower to the Middle or Upper Cockfield Formations and that the waste plume would remain confined to the Lower Cockfield Formation. And evidence was presented that, even if the waste plume migrated to the Upper Cockfield Formation, it would not occur in an area that would affect Denbury's current production.

33

As to Denbury's future plans to inject $CO_2$ into the Cockfield Formations, Denbury was only in the planning stages and had not determined the locations for its wells,[20] and one of its witnesses testified that injecting $CO_2$ would actually drive fluids down into the Middle and Lower Cockfield Formations.

The TCEQ's findings of fact included:

88.   The Cockfield Formation is made up of a thick marine mudstone section overlain by interbedded sands and shales.

89.   The Cockfield consists of four separate parts: (1) the Cockfield Shale Member (starting at 6,390 feet and extending deeper), (2) the Lower Cockfield Member (6.045 to 6,390 feet), (3) the Middle Cockfield Member (5,629 to 6,045 feet), and (4) the Upper Cockfield Member (5,134 to 5,629 feet).

90.   Within the Cockfield formation, most historical oil production within the Conroe Oil Field has been from the Upper Cockfield. None has been from the Lower Cockfield.

. . .

92.   The Lower Cockfield has sufficient thickness, porosity, permeability, areal extent, and lateral continuity to safely contain the proposed amount of injected fluid.

. . .

94.   The only place the Lower, Middle, and Upper Cockfield Members may be in communication with each other within the Area of Review (AOR) is at

---

[20]   Witnesses testified that Denbury's "actual concrete plan for Conroe [had] not been formalized"; Denbury did not "know how many wells exactly will be drilled"; "[t]he planning [was] still in the very preliminary stages"; and Denbury's plan was to "currently" produce "as is for probably the next five years while [it] put[s] the infrastructure necessary for an EOR project, and that's shorthand for enhanced oil recovery. And [Denbury will] be using that $CO_2$ technology to get the last economically recoverable oil with today's current technology."

the east-west running fault located 4,400 feet south of the site, the EW-4400-S fault.

. . .

97. By the 1930s, surface and production casings were being made of steel as opposed to wood, and state regulators had begun requiring actual surveying of well locations.

98. During the 1930s, nearly all oil and gas wells within the Conroe Oil Field were completed in the Upper Cockfield, except for a few that were drilled to the Wilcox sands (12,000 feet depth) that were dry holes and plugged.

99. Even if the field operator had drilled a well to a lower depth looking for oil, the operator would likely have plugged that well back to the Upper Cockfield with cement or mechanical plugs in order to prevent the inward flow of brine from the lower zones and for oil production.

100. More than 500 artificial penetrations pierce through the Jackson Shale Formation and into the Cockfield Formation within the AOR for TexCom's proposed operation.

101. By the early 1930s, the standard practice for abandoning oil wells was to plug them with cement.

102. If there were abandoned wells that had been drilled through the Jackson Shale formation that lacked adequate casing and were not plugged with cement, they would not have withstood the pressures exerted by the surrounding mudstone of the Jackson Shale formation and would have collapsed and naturally sealed within a matter of years.

103. The COI is the area within which the reservoir pressure build-up over the lifetime of the facility is sufficient to, theoretically, displace a drilling mud plug in an abandoned well exposed to that pressure build-up.

104. The Jackson Shale formation exists between 4,088 and 5,180 feet, for a total of 1,092 feet, in the area of TexCom's proposed wells.

105. In the area surrounding the Site, the overlying confining layers of the Jackson Shale formation and the underlying Cockfield Shale Member are free of transecting, vertically transmissive faults and fractures, and these formations

35

are sufficiently thick, impermeable, and laterally continuous to confine the injected wastewater.

106. The Jackson Shale formation is composed of a semi-solid, dough-like substance. It is impermeable, free from transmissive faults or fractures, and would prevent any upward migration of liquids out of the Cockfield formation in the AOR.

107. The Jackson Shale formation would likely have collapsed into and sealed any uncased or improperly cased abandoned boreholes drilled into the Upper Cockfield during the 1930s or earlier.

108. The Jackson Shale formation has a net impermeable shale thickness of approximately 1,000 feet.

109. Denbury's current hydrocarbon production wells completed in the Upper Cockfield within the Conroe Oil Field and along EW-4400-S currently produce about 11,300 barrels of fluid per day. Much of the fluid is formation water and brine.

110. For the entire Conroe Oil Field, Denbury currently produces about 2,500 barrels of oil per day and about 240,000 barrels of formation fluid and brine per day.

111. Denbury currently has one production well located about 3,000 feet from WDW315 [TexCom's existing injection well].

. . .

113. The layers of shale that separate the different members of the Cockfield formations and separate the Upper Cockfield from the Jackson Shale Formation would prevent the upward migration of fluids from the Lower Cockfield Injection Interval to the Middle and Upper Cockfield members of the Injection Zone.

. . .

115. The production of more than 700 million barrels of oil in the area indicates that the Jackson Formation is still acting as an intact trapping feature and has not been breached.

116. There are two relevant faults within the AOR. The first is the EW-4400-S fault, which has a 100 to 150-foot down-to-the-basin offset. The second is

36

a parallel fault with up to approximately 75 feet of down-to-the-basin offset, mapped on the extreme southern edge of the AOR.

117. The evidence was uncertain as to whether two faults within the AOR are laterally or vertically transmissive.

118. Neither of the two faults within the AOR is capable of propagating upward through the Jackson Formation because of, among other things, its dough-like consistency.

119. Any faults in the area, including those identified within the AOR, would be sealed by the mudstone of the Jackson Formation, which lacks the strength to maintain open channels.

. . .

138. The geology of the AOR, specifically the Cockfield layers of shale and the Jackson Shale formation would prevent the vertical migration of fluid that might endanger the USDWs and fresh or surface water.

. . .

151. TexCom adequately investigated and accounted for artificial penetrations within the AOR.

. . .

153. The reservoir modeling results were used to calculate an estimated lateral extent of the injected effluent into the Lower Cockfield through volumetric analysis. This analysis determined that the injected waste fluids would travel 2,770 feet from the wellbore within the Lower Cockfield over the lifetime of the facility.

. . .

175. In calculating the COI, TexCom assumed that it would be continuously injecting wastewater at its maximum injection rate (350 gallons per minute), 24-hours a day, 365 days a year, for 30 years.

. . .

37

178. The injected wastewater is not predicted to reach the EW-4400-S fault, and would remain contained in the Lower Cockfield. It will not be possible for wastewater injected by TexCom to travel upward through existing artificial penetrations and into a USDW. The maximum operating surface injection pressure of 1,250 psi will not cause movement of fluid out of the injection zone and subsequent contamination of USDWs and fresh or surface water.

Appellants have not made substantial evidence challenges to any of these findings of fact and, thus, we accept the facts stated therein as established. *See Madden v. State Bd. for Educator Certification*, No. 03-11-00584-CV, 2014 Tex. App. LEXIS 5444, at *29 n.4 (Tex. App.—Austin May 22, 2014, pet. denied) (mem. op.) (accepting agency's unchallenged fact findings as established on appeal); *Helbing v. Texas Dep't of Water Res.*, 713 S.W.2d 134, 137 (Tex. App.—Austin 1986, no writ) (accepting unchallenged finding of fact "as established").

Based on our review of the evidence including the evidence listed above, the evidence that we addressed concerning appellants' third issues, and the TCEQ's unchallenged findings of fact, we conclude that substantial evidence supports the TCEQ's Findings of Fact 114 and 198 and its Conclusion of Law 29. *See Charter Med.-Dallas*, 665 S.W.2d at 452; *Crystal Clear Water Supply Corp.*, 449 S.W.3d at 135.

**Challenges based on Reasonably Available Alternatives**

Based on their position that a reasonably available alternative existed to TexCom's proposed injection wells, the Individual Appellants argue that substantial evidence does not support the TCEQ's finding that there was no reasonably available alternatives to the disposal of non-hazardous waste in Montgomery County. The TCEQ's Findings of Fact 196, 236, and 237 addressed available alternatives:

196.	Conroe's POTW is not a reasonably available alternative to TexCom's proposed UIC wells for the disposal of Class I nonhazardous waste in the Montgomery County area.

. . .

236.	TexCom presented evidence regarding its analysis of whether any other alternative methods of disposal were feasible.

237.	Montgomery County has several hundred businesses that generate non-hazardous waste, but Huntsman and Chevron Petroleum generate the majority of non-hazardous waste. In comparison to other counties in the area, only Harris County generates more liquid wastes than Montgomery County. The wastewaters generated in Montgomery County area are generally not capable of being recycled because they are not concentrated, and do not contain substances of value in recoverable concentrations. The only in-county disposal options are a landfill at which solidification of liquid waste is not economical, and the public treatment plants, which are not reasonably available to accept all of the industrial wastewater generated in Montgomery County. The area served by the City of Conroe's POTW is less than half of Montgomery County, and not all industrial wastewaters generated within that area would be eligible for treatment at the POTW. A need for more nonhazardous waste disposal exists in the Montgomery County area to serve sources of nonhazardous wastewater in Montgomery County and nearby counties, including Harris County that cannot be served by existing alternatives. No other waste disposal option (discharge to surface waters, onsite storage, land disposal or incineration) is a practical, economic, feasible, and reasonably available alternative to injection. Local businesses could realize monetary savings by being able to dispose of wastewaters locally.

The TCEQ also made other findings concerning the City's POTW, generators of waste in the area, and other disposal facilities, including the following findings:

187.	The City of Conroe has a publicly owned treatment works (POTW) that is permitted by [the Commission] to dispose of pretreated Class I nonhazardous industrial wastewater.

39

188. Conroe POTW is regulated by [the Commission], the Environmental Protection Agency, and Conroe through ordinance.

189. Conroe POTW is capable of disposing of any Class I nonhazardous wastewater that is listed in TexCom's application as waste TexCom may dispose in its underground injection wells.

190. Conroe's POTW may discharge harmful effluent into the San Jacinto River.

191. Huntsman Petroleum (Huntsman), the largest generator of Class I wastewater in Montgomery County, has two [Commission] approved permits for underground injection disposal wells that it has not used.

192. Huntsman is located on Jefferson Chemical Road approximately a mile away from TexCom's facility.

193. Huntsman currently trucks the Class I nonhazardous waste it generates approximately 82 miles to another county for disposal.

194. Conroe's POTW does not accept hauled waste, so industrial customers must connect their wastewater stream to a sewer line to transport it to the POTW.

195. While some portion of the waste water sent to a POTW through a sewer line may leak, there is no evidence that the leakage will be significant enough to pollute or contaminate Montgomery County's drinking water.

. . .

238. Two other disposal sites exist within 100 miles that can accept nonhazardous wastewater, both outside Montgomery County.

The Individual Appellants have not made substantial evidence challenges to these findings and, thus, we accept the facts stated therein as established. *See Madden*, 2014 Tex. App. LEXIS 5444, at *29 n.4; *Helbing*, 713 S.W.2d at 137. The TCEQ's Conclusion of Law 41 also stated: "Under Tex. Health & Safety Code § 361.0231, it is the state public policy that adequate capacity shall exist for the proper management of industrial and hazardous waste generated in this state." *See* Tex. Health

40

& Safety Code § 361.0231 (addressing and defining "adequate capacity" for industrial and hazardous waste).

As previously stated, the TCEQ was required to find that "the use or installation of the injection well [was] in the public interest," and, in making its public interest inquiry, the TCEQ was required to consider specific criteria, including "whether there is a practical, economic, and feasible alternative to an injection well reasonably available," as well as other factors. *See* Tex. Water Code § 27.051(a)(1), (d). At the initial hearing and at the hearing on remand, the parties presented conflicting evidence about benefits, risks, and costs generally associated with injection wells over other disposal options and specific benefits, risks, and costs associated with TexCom's proposed injection wells as compared with other available options for disposing of industrial waste in Montgomery County, including the City's POTW. Evidence addressed potential leaks or endangerment to water sources from various alternative options, potential customers that were already generating waste in Montgomery County that would be suitable for disposal by injection well at TexCom's proposed facility, and the transportation and pre-treatment of waste that would be required at TexCom's proposed facility compared with the City's POTW.[21] As previously stated, the TCEQ determined that "90% of Montgomery County's existing commercial nonhazardous waste [was] going outside of the county for disposal" and that some generators within the County were not within the CCN of the City's POTW "where Protestants allege that the waste would be treated and disposed."

---

[21] For example, Conroe's assistant plant superintendent testified that its customers at the POTW had to connect to the system through sewer lines.

We may not substitute our judgment for that of the TCEQ on the weight of the evidence on its public interest determination, a question committed to the TCEQ's discretion. *See* Tex. Gov't Code § 2001.174. Based on our review of the record, we conclude that there was substantial evidence to support the TCEQ's findings concerning reasonably available alternatives for disposal. *See Charter Med.-Dallas*, 665 S.W.2d at 452; *Crystal Clear*, 449 S.W.3d at 135. We further observe that the unchallenged findings stated above support the TCEQ's conclusion that "use of [the] existing [w]ell . . . and installation of the three additional wells proposed by TexCom [was] in the public interest." Further, the TCEQ was required to consider "whether there [was] a practical, economic, and feasible alternative to [the proposed injection wells] reasonably available," but it was not required to make a particular finding on that consideration. *See* Tex. Water Code § 27.051(d) (requiring consideration but not particular finding). The record reflects that it considered alternatives. On these bases, we overrule appellants' fifth issues.

**Texas Open Meetings Act**

In their sixth issue, the County and City argue that the TCEQ's order should be reversed or remanded under the APA or declared void pursuant to the UDJA because the order—which was reissued in April 2011—violated the Open Meetings Act or was signed by the TCEQ Chairman without authority. *See* Tex. Gov't Code §§ 551.141 (stating that "action taken by a governmental body in violation of this chapter is voidable"), 2001.174(2) (A), (C). As a governmental body, the TCEQ was required to vote on TexCom's permit application at an open meeting of its commissioners after providing proper notice. *See id.* §§ 551.041 (requiring notice of meeting "held by the governmental body"), .102 (requiring "final action, decision, or vote on a

matter deliberated in a closed meeting under this chapter [to] be made in an open meeting that is held in compliance with the notice provisions of this chapter").

The County and City do not dispute that the TCEQ Commissioners voted on TexCom's permit application at an open meeting in January 2011, and that the meeting was properly noticed. At that meeting, the Commissioners voted two to one to

> adopt the ALJs' amended proposed order attached to their November 8, 2010 amended PFD with the following changes:
>
> A. We overturn the ALJs' proposed findings and conclusions on reasonable alternatives/public interest and protection of fresh groundwater . . . fresh ground and surface waters/sufficiency of the shale layers between the Lower, Middle and Upper Cockfield strata as being contrary to the preponderance of the evidence in the record.
>
> B. We adopt TexCom's proposed revisions both typographical and substantive to the ALJs' amended proposed order found on Pages 19 through 29 of their exceptions, which were filed on November 30, 2010.
>
> C. We grant TexCom's UIC permit application . . . .

In February 2011, the Chairman signed the TCEQ's corresponding order reflecting the Commissioners' vote at the open meeting and approving TexCom's permit applications but, after receiving comments from the parties, the order was revised and reissued in April 2011.

The County and the City focus on the "substantive and critical" change from the February order to the April order concerning TexCom's authorized "Injection Zone." Findings of fact in the February order reference the Lower Cockfield Formation as the "Injection Zone," but findings of fact in the April order reference the entire Cockfield Formation as the "Injection Zone." Based on this difference between the two orders, the County and City argue that "[l]ogic demands"

43

that either the Commissioners improperly met and decided to make the change after the open meeting in January or the Chairman made the change without proper authority.

TexCom's application and the draft permits, however, were based on an injection zone of the entire Cockfield Formation. Further, in its exceptions to the ALJs' PFD on remand, TexCom continued to seek an injection zone of the entire Cockfield Formation for its permits but represented that it would accept, among other alternatives, a revision to the permit that redefined the injection zone as the Lower Cockfield Formation "to the extent necessary to resolve any remaining migration concerns." As noted by the Executive Director in his motion for rehearing, the TCEQ did not adopt TexCom's proposed alternative concerning the injection zone during the open meeting. The Executive Director further explained that "[o]ther findings within the order and permits are not consistent with redesignation of the injection zone" and recommended revising the order concerning the injection zone to conform with the TCEQ's action at the open meeting in January 2011 on the permit application.

Consistent with the Executive Director's position in his motion for rehearing, the TCEQ's general counsel explained the basis for revising the injection zone in his letter to the parties that accompanied the April order:

> Finding of Fact Nos. 65 and 197 are being modified to remove the language suggested by the Applicant in its Exceptions, but not adopted by the Commission at the January 26, 2011 Agenda. These two findings were incorrectly changed to reflect the Applicant's offer, found in its Exceptions, to modify the injection zone from the entire Cockfield formation to only the Lower Cockfield. The Commission did not modify the injection zone pursuant to the Applicant's offer at the January 26, 2011 Agenda meeting. Thus, those two Findings should not have been modified and are now being revised to revert back to the language proposed by the ALJs in their

44

Proposed Amended Order. These inconsistencies, and the other errors detailed specifically below, are considered clerical errors now being ministerially rectified;
. . . .

The general counsel further explained in the letter to the parties that the revisions to the order were being made pursuant to section 5.110(d) of the Water Code, *see* Tex. Water Code § 5.110(d) (describing duties of general counsel and authorizing general counsel to exercise powers specifically delegated by TCEQ), and the TCEQ resolution that granted the General Counsel the "authority to make clerical and clarification changes to Orders and documents adopted by the Commission, to effectuate the clear intent of the Commission's action taken," *see* TCEQ Docket No. 2009-0059-RES (delegating to general counsel "[a]uthority to make clerical and clarification changes to Orders and documents adopted by the Commission, to effectuate the clear intent of the Commission's action taken"). He explained: "The modifications to the Commission's Order that are set forth above are clerical in nature and clearly effectuate the Commission's intent and decision at their January 26, 2011 Agenda meeting."

On this record, we cannot conclude that appellants have shown that the TCEQ violated the Open Meetings Act based on the revisions to the April order or that the Chairman acted without authority by signing this order. *See Hays County. v. Hays County Water Planning P'ship*, 106 S.W.3d 349, 356–57, 361 (Tex. App.—Austin 2003, no pet.) (holding that no Open Meetings violation was shown and explaining that "meeting must have occurred" in order to have Open Meetings violation and that it was not "uncommon for staff to speak with a commissioner for clarification in order to properly perform staff duties"). To the extent appellants make this claim as part of their suit for judicial review under the APA, we also observe that the County and City have

failed to show how their substantial rights were prejudiced concerning the revised "injection zone" in the April order. *See* Tex. Gov't Code § 2001.174(2) (requiring substantial rights of appellant to have been prejudiced before reversing and remanding case for further proceedings). On these bases, we overrule the County and City's sixth issue.

**Notice to the Mineral Interest Owners**

In their final issue, the County and City ask this Court to reconsider our ruling in *Texas Commission on Environmental Quality v. Denbury Onshore, LLC*, No. 03-11-00891-CV, 2014 Tex. App. LEXIS 7177, at \*1 (Tex. App.—Austin July 3, 2014, no pet.) (mem. op.). In that interlocutory appeal, we dismissed the claims brought by Bank of America, N.A., Trustee for Sabine Royalty Trust (Sabine), and the claims brought by other appellants based upon alleged lack of proper notice to Sabine of the administrative proceeding and concluded that the trial court did not have jurisdiction to consider those claims. *See id.*

The County and City argue that we may reconsider our ruling in the interlocutory appeal in this case and that the TCEQ's order should be reversed or declared void because the TCEQ did not provide the required notice of TexCom's application and the contested case hearing to the royalty interest owner Sabine. For the reasons stated in our opinion in the interlocutory appeal, we overrule this issue. *See id.* at \*10–31.

## CONCLUSION

Having overruled appellants' issues, we affirm the trial court's final judgment.

_____

Melissa Goodwin, Justice

Before Chief Justice Rose, Justices Goodwin and Kelly
    Dissenting opinion by Justice Kelly

Affirmed on Rehearing

Filed:   October 11, 2019